GALLIAN WELKER & BECKSTROM, L.C.
Nathan E. Lawrence, SBN 15060
Travis N. Barrick, SBN 9257
Michael I. Welker, SBN 7950
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Telephone: 702-892-3500
Facsimile: 702-386-1946
nlawrence@vegascase.com
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| RENAE JOY SWAIM, as Special Administrator of the Estate of Clinton Lee Swaim; RENAE JOY SWAIM, an individual; CLINTON THOMAS SWAIM, Jr., an individual; and RENAE JOY SWAIM, as parent and custodian of minor K.R.S.; collectively, | Case No.: |
| | Judge: |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| STATE OF NEVADA *ex rel.* NEVADA DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF PUBLIC AND BEHAVORIAL HEALTH; DAVID ATHERTON, an individual; MATT BOWMAN, an individual; DAIKI "SAM" BRANCH, an individual; JAMES CAMERON, an individual; VIVIAN DAVIS, an individual; ISAAC FLORES, an individual; JOEL GOMEZ, an individual; CHRIS HENRY, an individual; SAMANTHA LYONS, an individual; ERICK MCBRIDE, an individual; RICK MEIER, an individual; BRAD MITCHELL, an individual; LUIS OROZCO, an individual; LACEY PATIGA, an individual; NICHOLAS PATIGA, an | **JURY DEMAND** |

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

individual; BRANDON TAYLOR, an individual; TANNER TROUT, an individual; JOHN WEST, an individual; and DOES I to X, inclusive; collectively,

Defendants.

Plaintiffs RENAE JOY SWAIM, as (1) Special Administrator of the Estate of Clinton Lee Swaim, (2) individually, and (3) as parent and custodian of minor K.R.S, and CLINTON THOMAS SWAIM, Jr., by and through their attorneys of the law firm of GALLIAN WELKER & BECKSTROM, L.C., and in support of their claims against the Defendants, hereby aver and allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. At all times relevant hereto, Plaintiff RENAE JOY SWAIM ("Ms. Swaim"") is and was a resident of Washoe County, Nevada.

2. At all times relevant hereto, Plaintiff CLINTON THOMAS SWAIM, Jr. ("CJ") is and was a resident of Washoe County, Nevada.

3. At all times relevant hereto, minor Plaintiff K.R.S. ("KRS") is and was a resident of Washoe County, Nevada.

4. Decedent Clinton Lee Swaim ("Mr. Swaim") died on December 10, 2019, and was, at the time of his death a detainee at Lake's Crossing Center ("Lake's Crossing"), a maximum-security psychiatric facility, staffed and operated by Defendant NEVADA DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF PUBLIC AND BEHAVORIAL HEALTH, and located at 500 Galletti Way, Sparks (Washoe County), Nevada 89431.

5. Pursuant to Letters of Special Administration duly issued by the Second Judicial District Court of the State of Nevada in and for the County of Washoe on October 13, 2021, in Case No. PR21-00650, Ms. Swaim is the Special Administrator for the Estate of Clinton Lee Swaim (the "Estate").

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

6.      Defendant NEVADA DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF PUBLIC AND BEHAVORIAL HEALTH ("DPBH") is and was, at all times relevant hereto, a legal entity and, pursuant to NRS 232.290 to 232.359, inclusive, a duly authorized Department of the State of Nevada, with the Division of Public and Behavioral Health, being a duly authorized division thereof, pursuant to NRS 232.300(2)(b).

7.      Upon information and belief, Defendant DAVID ATHERTON is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist[1] and was acting under color of law within the course and scope of said employment by DPBH.

8.      Upon information and belief, Defendant MATT BOWMAN is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

9.      Upon information and belief, Defendant DAIKI "SAM" BRANCH is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

10.      Upon information and belief, Defendant JAMES CAMERON is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

11.      Upon information and belief, Defendant VIVIAN DAVIS is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

12.      Upon information and belief, Defendant ISAAC FLORES is a resident of the State

---

[1] "Forensic Specialists perform a combination of security and client care duties in a secure mental health facility for treatment/evaluation of the mentally and/or medically ill offender and/or offenders whose competency requires evaluation." https://www.careersingovernment.com/job/462096/forensic-specialist-1/

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

13. Upon information and belief, Defendant JOEL GOMEZ is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

14. Upon information and belief, Defendant CHRIS HENRY is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

15. Upon information and belief, Defendant SAMANTHA LYONS is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

16. Upon information and belief, Defendant ERICK MCBRIDE is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

17. Upon information and belief, Defendant RICK MEIER is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

18. Upon information and belief, Defendant BRAD MITCHELL is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

19. Upon information and belief, Defendant LUIS OROZCO is a resident of the State

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

20.     Upon information and belief, Defendant LACEY PATIGA is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

21.     Upon information and belief, Defendant NICHOLAS PATIGA is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

22.     Upon information and belief, Defendant BRANDON TAYLOR is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

23.     Upon information and belief, Defendant TANNER TROUT is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

24.     Upon information and belief, Defendant JOHN WEST is a resident of the State of Nevada and, at all times relevant hereto, was employed by DPBH at Lake's Crossing as a Forensic Specialist and was acting under color of law within the course and scope of said employment by DPBH.

25.     DOES I to X, inclusive, are parties in contemplation at the time of the filing of the original Complaint in this action. The true names, identities, and capacities of the Defendants sued herein as DOES I to X, inclusive, are Forensic Specialists, Nursing Staff Members, or other unspecified staff at Lake's Crossing employed by DPBH and acting under color of law within the course and scope of said employment by DPBH, but they are otherwise unknown and cannot

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

readily be discovered at this time by Plaintiffs, who sue those Defendants by such fictitious names. Plaintiffs allege, upon information and belief, that each of the Defendants sued herein as DOES I to X, inclusive, are responsible in some manner for the events and injuries alleged herein. Plaintiffs allege, upon information and belief, that DOES I to X, inclusive, are, and at all times relevant hereto were, residents of the state of Nevada or had a presence in Nevada or are otherwise amenable to suit in Nevada under Nevada's "Long-Arm" statutes. Plaintiffs will seek leave of Court to amend this Complaint to state the true names and capacities of DOES I to X, inclusive, when the true names and capacities have been ascertained.

26.    This action seeks damages pursuant to violations of the Fourteenth Amendment to the Constitution of the United States of America; accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 42 U.S.C. § 1983.

27.    This action further seeks damages pursuant to violations of Article 1, Section 8, of the Constitution of the State of Nevada and associated state claims under NRS 41.085 and NRS 41.031, for each of which cause of action this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

28.    This Court has personal jurisdiction over each Defendant, because Defendants are each residents or juristic entities domiciled in the District of Nevada and committed the alleged violations in the District of Nevada; accordingly, venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

### GENERAL FACTUAL ALLEGATIONS

29.    Plaintiffs reassert and reallege the allegations contained in Paragraphs 1 through 28 of this Complaint and, by this reference, incorporate them herein as if set forth in full.

30.    Prior to October 2019, Mr. Swaim was a retired Washoe County Sheriff's Deputy (with twenty-two years of service) and United States Navy Veteran (with four years of service) who lived with his high school sweetheart and wife of twenty-five years and minor daughter in Sparks, Nevada and worked regularly at a Treehouse Foods warehouse, also in Sparks, Nevada.

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

31.   On or about October 2, 2019, Mr. Swaim, who had previous diagnoses over the course of life for bipolar disorder and depression, suffered an acute mental health event of ultimately undetermined etiology, though relevant records indicate that he may have discontinued use of prescription medicines in the few weeks prior.

32.   Some time on October 2, 2019, Mr. Swaim left his home and walked approximately five miles to his mother-in-law's home, which he again left shortly thereafter, absent his shoes or shirt.

33.   On October 2, 2019, after 11:00 p.m. and in forty-eight-degree weather, Mr. Swaim was observed, disrobed, wandering through a retail store parking lot in Sparks, Nevada, in response to which a private party contacted the Sparks Police Department.

34.   The Sparks Police Department and Regional Emergency Medical Services Authority detained Mr. Swaim, at which time it was observed that he was evidently confused about his own actions and uncertain as to why he had disrobed; Mr. Swaim was also carrying a Bible and whispering into the empty night sky.

35.   It was determined by the Sparks Police Department and a counselor on scene that Mr. Swaim was unable to care for himself and should be detained pursuant to a legal hold for "Inability to Care for Yourself," and Mr. Swaim was subsequently transported to Renown Regional Medical Center where he was admitted for initial evaluation and treatment.

36.   Shortly thereafter, after Mr. Swaim was placed in a hospital room, a medical technician attempted to secure Mr. Swaim's vitals, including blood pressure and oxygen saturation levels, during which process, Mr. Swaim began to shake and indicate he was cold.

37.   While the medical technician was attempting to secure Mr. Swaim's oxygen saturation levels, Mr. Swaim suddenly jumped up, placing his arm around the technician's neck, squeezing, impacting the technician's breathing.

38.   Sparks Police Department officers in the hospital room immediately responded and tackled and "tased" Mr. Swaim, compelling him to release the medical technician, who suffered substantial, but temporary, injuries to her person (some of which occurred during and a as a result of being tackled by the police officers).

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

39.     Mr. Swaim, who had no prior criminal convictions, was handcuffed, arrested, and charged by the Washoe County Sheriff with one Category B Felony count of Battery on a Protected Person by Strangulation.

40.     On October 16, 2019, Mr. Swaim presented to Lake's Crossing for a Competency Evaluation pursuant to an order by the Justice Court of Reno Township under authority of NRS 178.415, regarding his present ability to understand the nature of the criminal charges against him, the nature and purpose of the court proceedings, and his ability to aid and assist with his criminal defense.

41.     Based on the Competency Evaluation interview and observed behavior, which collectively indicated prior suicide attempts, and ongoing symptoms of denial of his own name and identity, mania, agitation, paranoia, continued confusion, refusal to wear clothing, and a diagnosis of "Bipolar I Disorder, Most Recent Episode Manic, Severe, With Psychotic Features," Mr. Swaim was deemed incompetent to stand trial, a danger to himself, and requiring commitment and inpatient admission in order for Mr. Swaim to reattain competence and receive mental health treatment from multiple therapeutic modalities.

42.     On October 29, 2019, an Order was entered by the Second Judicial District Court of the State of Nevada in and for the County of Washoe in Case No. CV19-01975, remanding Mr. Swaim to Lake's Crossing in accord with the notations in the above Paragraph 41.

43.     Upon or shortly after his arrival at Lake's Crossing on November 14, 2019, Mr. Swaim was designated by Lake's Crossing for "Constant" watch due to suicide risk, which is the highest level of oversight at the facility and requires constant monitoring by camera and by staff every fifteen (15) minutes.[2]

44.     Mr. Swaim was, sometime thereafter, reclassified under "Q15 Special" watch (also for, *inter alia*, suicide risk), which requires consistent visual observation of detainees ("clients") "to check to see if there is chest movement," as well as further mandating that "[a]ll head counts and special watches shall include visual contact with the client [and…] may include pulling back

---

[2] Quoted references herein and in Paragraphs 44 and 45 are excerpted from Lake's Crossing Policy Sections 4.003 – 4.005.

bed covers, using lights, etc. to assure visual recognition and client's physical condition."

45. All relevant staff at Lake's Crossing were duly informed of Mr. Swaim's watch status, ostensibly with the additional understanding that the Lake's Crossing policy required "that any client placed on suicide or self-mutilation watch shall not have the means to inflict injury to themselves, due to personal belonging, or to have items readily available to cause injury," and "'Clients placed on Suicide Watch will NOT be allowed to have any items in their rooms," without written exceptions outlined in the client's program orders."

46. For approximately one month, Mr. Swaim's detention at Lake's Crossing was largely unremarkable, in context.

47. On December 10, 2019, while detained at Lake's Crossing and despite being designated by that facility as being on "Suicide & Self-Mutilation Watch" and under the "Special Watch Policy," the entirely unwatched Mr. Swaim ended his own life by hanging himself with a bedsheet.

48. On December 8 and 9, 2019, prior to taking his life, Mr. Swaim's demeanor and behavior observably changed, with altered mood and affect visible to other detainees and certain Lake's Crossing staff, yet, despite the evident shift in mood and behavior, no additional action or oversight was undertaken by Lake's Crossing staff, even though it was known and certain that Mr. Swaim was an acknowledged suicide risk.

49. On the night of December 9, 2019, and into the early morning hours of December 10, 2019, Lake's Crossing staff routinely and regularly failed to exercise due diligence in keeping a "constant" watch on Mr. Swaim, failed to perform their duty in accord with Lake's Crossing Policy and as would reasonably be expected in order to assure Mr. Swaim's safety, and failed to prevent Mr. Swaim from irrevocably acting on his known suicide risk.

50. As is detailed more fully below, on the night of December 9, 2019, and into the early morning hours of December 10, 2019, Lake's Crossing staff did not assure that Mr. Swaim did not have access to the means to injure himself (in fact, the implements of Mr. Swaim's death were provided to him directly by Lake's Crossing staff), nor did the Lake' Crossing staff regularly (or, seemingly, at all) check Mr. Swaim for "chest movement" or otherwise make "visual contact

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

with [Mr. Swaim]… to assure visual recognition and client's physical condition."

51.    At approximately 8:26 on the morning of December 10, 2019, Mr. Swaim was found dead in his room, hung by his own bedsheet which had been "knotted three (3) times" and "looped around the sink and placed over the top of the [five-foot] privacy wall."[3]

52.    In response to Mr. Swaim's suicide, an investigation was undertaken by Detective Earl of the Department of Public Safety, leading to a report under Investigation Division Case 19I000764[4] which summarily enumerates the deliberate and persistent pattern of indifference to Mr. Swaim's serious mental health condition, as below, ultimately requesting that the matter be "forwarded to the Nevada Attorney General's Office for review and determination of any criminal culpability."[5]

   a. Det. Earl noted that it did not appear the staff conducted the "visual contact" procedure as outlined in Procedure # 7 consistently if at all.
   b. Det. Earl noted the "every 15 minutes" check was not consistently, if at all, conducted on SWAIM. SWAIM, according to this policy, would have been considered a Constant Suicide/Q15 Suicide watch level.
   c. Det. Earl noted that it did not appear that [Lake's Crossing] followed proper procedure outlined in this policy due to the fact there were other items in SWAIM'S room such as "extra bed linen" for example.
   d. Det. Earl found several inconsistencies between the procedures outlined in the [Lake's Crossing] policies and the actual way these procedures were performed by [Lake's Crossing] staff as documented via the review of the [Lake's Crossing] video surveillance footage.
   e. The [Lake's Crossing] video surveillance footage showed that the [Lake's Crossing] staff did not consistently (if at all) perform their duties as outlined in the following [Lake's Crossing] policies: Policy #4.003 – Head Count, Policy #4.004 – Special Watch/Program Orders, and Policy #4.005 – Suicide and Self-Mutilation Watch.

---

[3] Quotes referenced herein and in the Paragraphs following are from the February 10, 2021, Department of Public Safety Report, for Investigation Division Case 19I000764, authored by Detective Earl. The date of the report, as noted, is much after the events in question, but the Report is clear that the investigation was conducted immediately, starting the day Mr. Swaim was discovered, on December 10, 2019.

[4] The Report is predicated on and cites to interviews with Lake's Crossing staff and facility video footage which are not yet in Plaintiffs' possession.

[5] It is not known to Plaintiffs at this time if any such referral was made or, if so, what determinations were made by that office. All subparagraphs here are directly excerpted from the noted Report.

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

f. The most blaring of these policy violations pertained to Policy #4.003 - Procedure #7 which states: "All head counts, and special watches shall include visual contacted with the client. This may include pulling back bed covers, using lights, etc. to assure visual recognition and client's physical condition. Flashlights will be used in necessary."

g. Det. Earl noted it would have been virtually impossible based on the manner in which [Lake's Crossing] conducted their room checks via "quick walk-bys", and the fact the lights in SWAIM'S were off which was evident by some of the FS use of their flashlights as they walked by his door, to have been able to recognize SWAIM'S physical condition.

h. At no time between approximately 2015 hours on December 9[, 2109] until approximately 0826 hours on December 10[, 2019], when N. PATIGA discovered SWAIM, did Det. Earl observe any [Lake's Crossing] staff member ever enter SWAIM'S room in order "to assure visual recognition and client's physical condition," as outlined in Procedure #7.

i. Det. Earl specifically noted that on December 10[, 2019], between approximately 0427 hours and 0445 hours based on client BOSTWICK's demeanor and actions, BOSTWICK heard noises coming from SWAIM'S room as he was in the process of taking his life.

j. Although there was no audio, it appeared BOSTWICK made several attempts to tell FS GOMEZ "something." It was apparent that BOSTWICK was trying to tell GOMEZ what he heard coming from SWAIM'S room; and that GOMEZ in essence "blew off" BOSTWICK and did not take what BOSTWICK had him seriously.

k. After BOSTWICK and GOMEZ conversed, he (GOMEZ) immediately crossed from the east side of the hall (where he spoke to BOSTWICK) to the west side of the hall, which completely bypassed SWAIM'S room altogether.

l. According to the timestamps observed on the video surveillance footage from the time BOSTWICK first appeared to be listening to sounds coming from SWAIMS room, to the time where BOSTWICK and GOMEZ conversed until the time GOMEZ exited the hall, very little time passed, approximately a minute.

m. It is plausible that had GOMEZ conducted a check of SWAIM in the manner as required by LCC policy at that time, he may have been able to discover/assist SWAIM at that time or even when he returned to conduct another round of visual room checks approximately five (5) minutes later.

n. It is important to note here, that WCME Dr. Callahan explained SWAIM would have lost consciousness very quickly, in a matter of seconds, it would have taken approximately 5 to 8 minutes for death to occur.

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

53. The above acts and omissions by all Defendants constitute deliberate indifference to Mr. Swaim's serious medical (mental health) condition with associated known risk of self-harm and/or suicide and such acts and omissions directly led to Mr. Swaim's untimely and wrongful death.

## FIRST CLAIM FOR RELIEF

### *As to All Defendants;*

### *Deliberate Indifference to a Serious Medical Need*

54. Plaintiffs reassert and reallege the allegations contained in Paragraphs 1 through 53 of this Complaint and, by this reference, incorporate them herein as if set forth in full.

55. To maintain a claim of deliberate indifference to a serious medical need under the Fourteenth Amendment, a pretrial detainee, like Mr. Swaim, must allege four separate elements: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *See Gordon v. Cty. of Orange*, 888 F. 3d 1118 (9th Cir. 2018).

56. As detailed above, each individually named Defendant, all of whom were Forensic Specialists on duty and on watch, acting under color of law within the course and scope of their individual employment by DPBH, made an intentional decision to not follow applicable and governing Lake's Crossing policy with respect to the consistent and timely (no less than every fifteen minutes) visual observation of Mr. Swaim, to check to see if there was chest movement and to assure visual contact, recognition, and ascertainment of physical condition.

57. As further detailed above, each individually named Defendant, all of whom were Forensic Specialists on duty and on watch, acting under color of law within the course and scope of their individual employment by DPBH, made an intentional decision to not follow applicable

and governing Lake's Crossing policy with respect to assuring that Mr. Swaim did not have the means to inflict injury to himself, due to personal belonging, or to have other items readily available to cause self-inflicted injury.

58.    All of the individual Defendant's individual acts or omissions put Mr. Swaim at substantial risk of suffering serious harm (to wit, death), which harm was fully manifested when Mr. Swaim was allowed to commit suicide with the bed sheets that Lake's Crossing had provided to him.

59.    Despite the awareness of the indicated watch status and the high degree of risk associated with failure to follow requisite protocol, each individual Defendant failed to take necessary reasonable (even easy) measures to abate Mr. Swaim's risk, when each repeatedly failed to make visual contact through a door window with Mr. Swaim every fifteen minutes to assure his physical condition or to remove such items from his room as could lead to his harm.

60.    The consistent and persistent behavior by no less than eighteen individual Defendants, acting under color of law within the course and scope of their individual employment by DPBH, demonstrates a custom, pattern, and practice approved and endorsed by the DPBH, fairly representing its official policy, wherein the written Lake's Crossing policy and the various detainee's safety and mental health conditions are deliberately and intentionally ignored, and the risks associated with detainees on suicide watch (or similar designation) is entirely discounted and disregarded, which, pursuant to *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978), accords liability to DPBH for the noted constitutional deprivations as relate to Mr. Swaim.

61.    As a result of every named Defendants' actions, Mr. Swaim's Fourteenth Amendment rights were unequivocally violated, leading to his wrongful and untimely death.

62.    The indicated acts and omissions by each of the Defendants are the direct and proximate cause of Mr. Swaim's death and associated pain and suffering, for which his Estate is entitled to recover, on Mr. Swaim's behalf, monetary damages, including exemplary and punitive damages.

/ / /

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

## SECOND CLAIM FOR RELIEF

### *As to All Defendants;*

### *Wrongful Death under NRS 41.085*

63.     Plaintiffs reassert and reallege the allegations contained in Paragraphs 1 through 62 of this Complaint and, by this reference, incorporate them herein as if set forth in full.

64.     NRS 41.085(2) indicates that "[w]hen the death of any person … is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death."

65.     Each of Defendants' wrongful acts or negligent omissions as fully described hereinabove are the direct and proximate cause Mr. Swaim's death and associated pain and suffering.

66.     As a result of Mr. Swaim's death, each Plaintiff suffered significant damages.

67.     In accord with the provisions of NRS 41.085(4), Mr. Swaim's heirs, to wit, Ms. Swaim, in her individual capacity, CJ, and KRS are each entitled to recover "pecuniary damages for the person's grief or sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering, or disfigurement" of Mr. Swaim.

68.     In accord with the provisions of NRS 41.085(5), Ms. Swaim, as Special Administrator of the Estate, is entitled to recover "all special damages… including funeral expenses."[6]

## THIRD CLAIM FOR RELIEF

### *As to All Defendants;*

### *Negligence*

69.     Plaintiffs reassert and reallege the allegations contained in Paragraphs 1 through 68 of this Complaint and, by this reference, incorporate them herein as if set forth in full.

70.     The individual Defendants each owed Mr. Swaim a duty to adhere to the applicable written Lake's Crossing policies with respect to assuring Mr. Swaim's safety as an individual

---

[6] Exemplary and punitive damages, normally available to the Estate under NRS 41.085, are excluded by NRS 41.035.

with a known risk of substantial self-harm.

71.    Further, the individual Defendants each owed Mr. Swaim a duty, as his guardians and detainers, to take all reasonably necessary steps to assure Mr. Swaim's safety, including risk of injury to Mr. Swaim by himself, external sources, or other third parties.

72.    Without limitation and via the doctrine of *respondeat superior*, Defendant DPBH, for whom each individual Defendant was acting under color of law within the course and scope of their individual employment by DPBH, also owed Mr. Swaim the respective duties noted above.

73.    Each Defendant violated their respective duties to adhere to applicable policy and to take all reasonably necessary steps to assure Mr. Swaim's safety.

74.    As a direct and proximate result of each of the Defendants' breach of their respective duties, Mr. Swaim suffered pain, suffering, and wrongful death

75.    As a result of Mr. Swaim's death, each Plaintiff suffered significant damages.

76.    Mr. Swaim's heirs, to wit, Ms. Swaim, in her individual capacity, CJ, and KRS are each entitled to recover their particularized damages for their grief or sorrow, loss of probable support (Ms. Swaim and KRS), companionship, society, comfort and consortium, and damages for pain, suffering, or disfigurement of Mr. Swaim.

77.    Ms. Swaim, as Special Administrator of the Estate, is entitled to recover all special damages, including funeral expenses.

**FOURTH CLAIM FOR RELIEF**

*As to Defendants State of Nevada (DPBH);*

*Negligent Hiring, Training, Selection, and Supervision*

78.    Plaintiffs reassert and reallege the allegations contained in Paragraphs 1 through 77 of this Complaint and, by this reference, incorporate them herein as if set forth in full.

79.    Defendant DPBH, as well as other individuals, staff, managers, and officers employed by or acting under the authority of DPBH, had a mandatory duty to properly and completely regulate, train, test, and supervise all personnel under their control so as to avoid

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

unreasonable risk of harm to Lake's Crossing detainees, including Mr. Swaim.

80.    Defendant DPBH, as well as other individuals, staff, managers, and officers employed by or acting under the authority of DPBH, negligently breached their duty of care to Mr. Swaim in that they failed to adequately train and supervise their personnel to follow written Lake's Crossing policy and to otherwise take all necessary steps to assure the safety and well-being of Mr. Swaim and other detainees.

81.    As a direct and proximate result Defendants DPBH's breach of its duty to properly and completely regulate, train, test, and supervise all personnel under their control so as to avoid unreasonable risk of harm to Lake's Crossing detainees, Mr. Swaim suffered pain, suffering, and wrongful death.

82.    As a result of Mr. Swaim's death, each Plaintiff suffered significant damages.

83.    Mr. Swaim's heirs, to wit, Ms. Swaim, in her individual capacity, CJ, and KRS are each entitled to recover their particularized damages for their grief or sorrow, loss of probable support (Ms. Swaim and KRS), companionship, society, comfort and consortium, and damages for pain, suffering, or disfigurement of Mr. Swaim.

84.    Ms. Swaim, as Special Administrator of the Estate, is entitled to recover all special damages, including funeral expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs hereby respectfully request judgment in their favor and against Defendants as follows:

1.  As to the first claim for relief, monetary damages, including exemplary and punitive damages;

2.  As to the second, third, and fourth claims for relief, damages for emotional distress and for loss of the love, affection, nurturing, guidance, expectation of inheritance, assistance, services, happiness of association, care, training, counsel, advice, society of Mr. Swaim, and other benefits of the relationship between Mr. Swaim and his heirs;

GALLIAN WELKER & BECKSTROM, L.C.
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Phone 702-892-3500

3.  For Plaintiffs' loss of past and future economic support as heirs of Mr. Swaim;

4.  For expenses for funeral and burial;

5.  For pre-judgment and post-judgment interest as allowed by law;

6.  For attorneys' fees and costs accrued and accruing; and

7.  For such other and further relief as the Court deems just under the circumstances.

DATED this 7th day of December 2021.

GALLIAN WELKER & BECKSTROM, L.C.

Nathan E. Lawrence, SBN 15060
Travis N. Barrick, SBN 9257
Michael I. Welker, SBN 7950
540 East St. Louis Avenue
Las Vegas, Nevada 89104
Telephone: 702-892-3500
Facsimile: 702-386-1946
nlawrence@vegascase.com
*Attorney for Plaintiffs*